UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:14-cr-10186-FDS |
| | ) | |
| | ) | |
| GEORGE ENGLEHART | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.      Introduction**

At the time of his offense, George Englehart was 50 years old. His life had been indelibly marked by an abusive childhood, mental illness, substance abuse, and incarceration. Released from a Massachusetts sentence in 2012, he obtained a job as a dishwasher at TGI Friday's. PSR ¶¶ 67, 68, 110. With nowhere else to go, he moved in with his elderly mother, attempting to care for her as her dementia steadily worsened. PSR ¶ 91. He was taking medication and participating in therapy as treatment for Schizoaffective Disorder, Post-Traumatic Stress Disorder, Obsessive Compulsive Disorder, and Attention Deficit Hyperactive Disorder. PSR ¶ 102.

In this environment, George Englehart was unable to manage his recovery. PSR ¶ 104. He lost his job after overdosing on heroin in the bathroom. PSR ¶ 110. He then committed another robbery to support an addiction. He was arrested standing outside the bank with money spilling out of his pocket, and later at the police station images of child pornography were found on his cell phone. PSR ¶¶ 11, 16. After his arrest his sister provided the police with his laptop

1

computer, which contained no such images. PSR ¶ 17. In retrieving the computer for police she found clear evidence of the extent of his disarray, with his "room in shambles with needles all over the floor." Exhibit A.

The circumstances of George Englehart's life are crucial in determining a fair and just sentence. Mr. Englehart and the government agree that in light of all the sentencing factors of § 3553(a), the career offender guideline range of 188 to 235 months is unnecessarily severe. Pursuant to the plea agreement, the government will recommend not more than 151 months. Mr. Englehart agrees that a lengthy sentence is warranted and recommends that he spend the entire decade of his 50s in federal prison under a sentence of 120 months. The lack of supervision following his prior sentences should not be repeated, and he should be placed on supervised release with tailored conditions for a period of seven years. Such a sentence, on all the facts of this case and this defendant, is "sufficient but *not greater than necessary*" to achieve the goals of sentencing.  18 U.S.C. § 3553(a)(1)(emphasis added).   Such a sentence can fairly be said to be, in the terms of the First Circuit, "a sentence that is *minimally* sufficient to achieve the broad goals of sentencing."  United States v. Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008) (emphasis added).  In plain language, the defense contends that a sentence of 10 years at this late point in Mr. Englehart's traumatic life is enough.


**II.**     **Instability, mental illness, and substance abuse have driven George Englehart's offending from an early age.**


George Englehart is the oldest of four siblings born to parents who were both addicts. The scars of this legacy are obvious. The next youngest child, George's sister Linda, battles

alcoholism. PSR ¶ 86. The youngest, Susan, died of a heroin overdose in 2012, leaving behind

four children in the care of the state. PSR ¶ 90; Exhibit A. Younger brother Chris has a family in

Florida and is employed, and it may that his stability is either the cause or result of the distance

from his family.

Both Mr. Englehart's parents have passed away. His father died of kidney complications

from alcoholism in 2010 and his mother of complications following surgery in 2014. PSR ¶¶ 86,

87. His sister Linda Susi, two years younger, is the only other person with firsthand knowledge

of George's terrible experiences during his childhood.

In her letter attached at Exhibit A, Ms. Susi describes a household in chaos.[1] Their parents

"fought constantly, and our house was very volatile." Their father was an alcoholic who was

physically abusive towards their mother. PSR ¶ 84; Exhibit A.  She recalls George as the older

brother who would cover her ears during their parents' fights and tell her everything would be all

right. She remembers him as her "protector." Exhibit A.

Eventually George and Linda's father left, but his absence did not make the home any more

stable. Their mother now had four children to raise on her own, and her own addiction made that

untenable. At a very young age Linda tried to keep the family running by cooking and cleaning.

Exhibit A. She believes their mother took out her anger at their father on George, the oldest, and

a boy. Id. She kicked him out of the house regularly starting around age 12. As a teen he began

to run away on his own. Exhibit A, PSR ¶ 85.

---

[1] Ms. Susi wrote her letter in June 2015 to be submitted to the government during plea
negotiations.

A little boy cannot act as a protector from such trauma without consequences. The toxic environment of his home led him to act out and he first started seeing a therapist at 10 years old. PSR ¶ 100. His mental illness has continued throughout his life. He has received treatment for serious diagnoses such as Schizoaffective Disroder and Post-Traumatic Stress Disorder both while incarcerated and in the community. PSR ¶¶ 101-103. He has sought treatment on his own, and he continues to seek treatment in the future. Id.

But no amount of individual treatment could resolve the dysfunction at his home. He began drinking and smoking marijuana at age 15. Adding substance use to mental illness and family chaos, it is not surprising he did not complete high school. PSR ¶ 108. His high school transcript, attached at Exhibit B, documents a precipitous decline in 1980-81, his junior year. His academic average dropped significantly from the first to fourth quarter in all but one class. His senior year contains no grades at all, and the reason for withdrawal is listed as "incarcerated." Exhibit B.

The criminal history documented in the presentence report mirrors the cascade of failures in George Englehart's life. His offenses began at age 17. PSR ¶ 49. He continued to commit drug, property, and motor vehicle offenses for several years.  PSR ¶¶ 49-58. The more serious offense of attempted robbery at PSR ¶ 59 shows Mr. Englehart's continued addiction. He was observed to be under the influence, tried to rob a convenience store with a ketchup bottle, and subsequent to arrest was committed to the Bridgewater Addiction Center for 30 days. He served 5 years of a 10 year sentence. PSR ¶ 59. It was during this sentence that he attempted to fill the gaps in his education, earning his GED and even taking college courses in which he earned A's and B's, showing that with structure and support he can be successful. PSR ¶ 108; Exhibit C.

Following his release from that sentence in September 1996 (PSR ¶ 59), Mr. Englehart continued to offend, but again with property and motor vehicle crimes for nearly six years. PSR ¶¶ 60-66. In his mid to late 30's  heroin became his drug of choice. PSR ¶ 104. His offending subsequently became more serious, and he committed bank robberies similar to the present offense in 2002 at age 38 and in 2007 at age 43. PSR ¶¶ 67, 68. In addition to the state prison sentences he received for these cases, his heroin use led to other serious consequences as well. Like his sister, his long-time girlfriend died of a heroin overdose in 2012. PSR ¶95.

III.     **The career offender range is excessive in light of Mr. Englehart's upbringing, mental illness, substance abuse, and age.**

The Sentencing Guidelines are merely advisory and courts must not presume that a sentence within the advisory guideline range is appropriate. See Nelson v. United States, 555 U.S. 350, 252 (2009) (per curiam) "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." Id. (original emphasis);  Gall v. United States, 552 U.S. 38, 51 (2007); Kimbrough v. United States, 552 U.S. 85, 111 (2007); United States v. Booker, 543 U.S. 220, 264 (2005).

The principle of parsimony is increasingly stretched thin at the highest guideline ranges, including the career offender guideline. The justification must rise with each additional month of incarceration. With a low end of nearly 16 years, the career offender guideline is regularly recognized as unnecessarily harsh.

Statistics compiled by the United States Sentencing Commission show that nationally, career offender defendants receive sentences within the guideline range in less than one-third of cases.

United States Sentencing Commission, "Quick Facts-Career Offenders," available at

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

facts/Quick_Facts_Career_Offender_FY14.pdf.  The rate of within-range career offender

sentences continues a long downward trend, going from 33.2% in FY2010 to 27.5% in FY 2014.

Id. As in this case, many of the below guideline sentences were government sponsored even

without substantial assistance. Id. (44.7% of government sponsored below range sentences

"other" than substantial assistance.) That is also the case here, based on the government's

recognition of all the relevant sentencing factors.

The general judicial disfavor for the career offender guideline nationally is present in the

District of Massachusetts as well, where sentences below the career offender range are not

unusual, including in career offender bank robberies. Statistics for the frequency of sentences

relative to the range in such cases are not available for the district as they are nationally, but

recent cases show the same below career offender results. See, e.g., U.S. v. Wilcox,14-cr-10212-

RWZ  (guideline range 151-188, government recommendation 151, sentenced to 96 months);

U.S. v. Livramento, 13-cr-10035-PBS (guideline range 188-235, government recommendation

151,  sentenced to 151 months); U.S. v. Briand, 13-cr-10333-WGY (guideline range 151-188,

binding plea agreement to 120 months); U.S. v. James Ferguson, 12-cr-10241-FDS (guideline

range 188-235, sentenced to 152 months); U.S. v. Joseph Benzan, 08-cr-10059-DPW (guideline

range 151-188, sentenced to 120 months).[2] In comparison to each of the cited cases, a sentence

---

[2] Each of the cases cited in this paragraph is for a bank robbery where the defendant was
determined to be a career offender.

for Mr. Englehart within the career offender range would result in unwarranted sentencing disparity.

The offense level for Mr. Englehart's two offenses apart from the career offender guideline would be 32 prior to the reduction for acceptance of responsibility. PSR ¶ 42. With the three point acceptance reduction it would be 29. His non-career offender criminal history category would IV based on nine criminal history points. PSR ¶ 69. The range for offense level 29 in category IV is 121-151 months.

However, Mr. Englehart's recommendation is not simply based on the non-career offender range. This alternative range is driven by the child pornography guideline, which results in the higher of the two adjusted offense levels (31 for child pornography, 25 for bank robbery). PSR ¶¶ 29, 40.  The child pornography guideline is now generally viewed as flawed because it has been dictated by Congress and not supported by empirical data. The Second Circuit has described it as "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." Dorvee, 616 F.3d at 188.  The Dorvee Court further analyzed how the mechanical application of the child pornography guidelines was "fundamentally incompatible with § 3553(a)." Id. at 187. Specifically, the Court addressed the numerous enhancements that apply in almost every case. Such enhancements include the use of a computer, which in the age of the internet is very nearly an element of the offense. In Mr. Englehart's case, the questionable enhancements include image of a person under 12, sadistic or masochistic conduct, use of computer, and number of images. PSR ¶¶ 31-34. The First Circuit has acknowledged the widespread criticism of the guideline. United States v. King, 741 F.3d 305, 309 (1st Cir. 2014) ("Let us be perfectly clear. We are not unsympathetic to concerns about

perceived harshness in the child pornography guidelines.") In recognition of these flaws, it has

been this Court's practice to discount the four level increase that results from application of the

prepubescent minor and use of computer enhancements.  See, e.g., Excerpt Transcript of

Sentencing at 6, <u>United States v. Bhavsar</u>, Criminal No. 10-CR-40018-FDS, ECF No. 56;

Transcript of Sentencing at 130, <u>United States v. Kearney</u>, 08-CR-40022-FDS, ECF No. 151.

In light of the unreasonable enhancements, were child pornography Mr. Englehart's only

offense the defense would be recommending less than 120 months incarceration and seven years

supervised release. The enhancements in his case are the same as in nearly every other child

pornography offense. He did not trade any images. His crime was one of possession, and his

possession was limited to his cell phone, as there were no such images on his laptop at home.

PSR ¶ 17. He has no prior history of sexual offenses of any kind. Law enforcement officers have

interviewed minor family members and there is no suggestion that Mr. Englehart was

inappropriate in any way. PSR ¶ 93. His sister Linda Susi is understandably upset about this

offense and the repercussions on his family, but she still does not have any concerns about his

behavior with children. Exhibit A.

Of course, child pornography is not Mr. Englehart's only offense. The defense

recommendation is an acknowledgment that both his crimes are serious, and that both caused

harm to the victims. The length of both the recommended sentence and period of supervised

release account for the needs for just punishment and deterrence as well as opportunities for

treatment and rehabilitation.

**IV.** **Mr. Englehart's age and the close monitoring of federal supervised release suggest a lower risk of recidivism.**

Were the Court to adopt the defense recommendation, Mr. Englehart would not experience liberty again until he was nearly sixty. During his incarceration he would have the opportunity for sex offender, substance abuse, and mental health treatment far beyond what was available during prior incarcerations. During those periods he took advantage of the opportunities that were available, enrolling in college courses, participating in substance abuse treatment, and obtaining employment. PSR ¶¶ 67, 108. This history suggests he will take advantage of the increased opportunities present in the Bureau of Prisons.

The Sentencing Commission has found that recidivism rates decline relatively consistently as age increases. "Measuring Recidivism," United States Sentencing Commission (May 2004). The Office of the Inspector General reached the same results in a recent study. "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," Office of the Inspector General, Department of Justice (May 2015) (available at https://oig.justice.gov/reports/2015/e1505.pdf) ("OIG study"). The study was based on 381 inmates over age 50 released between 2006 at 2010. Id at 39. The three-year arrest rate for inmates age 55-59 at time of release was 16%. Id. For inmates age 60-64 at time of release it dropped to 8%. Id. The OIG study compared these rates to Bureau of Justice Statistics findings from 2014 showing the three-year recidivist rate for inmates 40 and over to be 60% and for inmates 30 and under to be 70%. Id. It was precisely because there were no statistics available for inmates over age 50 that the OIG conducted the study. Id.

The OIG study also found that aging inmates commit fewer disciplinary infractions than younger inmates. Id at 38. Mr. Englehart himself is an example of this finding. While prior incarcerations showed both participation in programs and disciplinary violations, his pretrial detention in this matter has been incident free. Compare PSR ¶ 4 and ¶ 67.

In addition to the prospects for treatment and the natural aging process, Mr. Englehart will also face very different circumstances upon his release to federal supervision than upon release in prior cases. Rather than living with his very sick, elderly mother, he should be required to reside for a period of time in a Residential Re-Entry Center. PSR ¶ 34, Proposed Special Conditions. He should also be required to continue mental health treatment, substance abuse treatment, and sex offender treatment. Id. Unlike his last release, he will be drug tested by the probation department for many years, rather than just a few months. Id. This is a critical distinction, as relapse will be detected and consequences imposed for substance abuse itself, rather than any resulting new crimes. Following his last incarceration there was no post-release supervision apart from a short period of parole. This time there will be lengthy supervision, and the monitoring will be strict, with both greater opportunities for intervention and more immediate consequences for violations than while under state supervision. These resources, coupled with Mr. Englehart's age at the time of any release, support the recommendation of a 10-year sentence.

V.      **Conclusion**

George Englehart has made attempts to better himself despite the traumatic legacies of his upbringing. He has sought education, mental health treatment, substance abuse treatment, and employment both while incarcerated and in the community. Yet the enormity of the problems that began in an abusive and chaotic childhood proved too much and he offended again in this case. Due to his age and the nature of supervision while on federal supervised release, there is reason to believe he will be better able to maintain sobriety by relying on the professional assistance he continues to seek. For all these reasons, and in consideration of the sentencing guidelines and the sentencing factors of 18 U.S.C. § 3553(a), the defense requests the Court impose a sentence of 120 months incarceration and 7 years supervised release.

> Respectfully submitted,
> GEORGE ENGLEHART
> by his attorney
> */s/ Joshua Hanye*
> Joshua Hanye, BBO#661686
> FEDERAL PUBLIC DEFENDER OFFICE
> 51 Sleeper Street, 5th Floor
> Boston, MA 02210
> 617-223-8061

**Certificate of Service**

I, Joshua Hanye, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"). PDF copies were e-mailed to AUSA Kenneth Shine and USPO Tricia Marcy.

Date: November 29, 2015                                       */s/ Joshua Hanye*
                                                             Joshua Hanye